# EXHIBIT 1

***EFILED***
Case Number 2026LA000209
Date: 2/12/2026 10:25 AM
Patrick McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

## IN THE CIRCUIT COURT
## OF THE THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

CYNTHIA ACEVEDO, individually and
on behalf of her minor child, N.A.,

      Plaintiff,

vs.

MEAD JOHNSON & COMPANY, LLC,

SERVE:
Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

And

MEAD JOHNSON NUTRITION
COMPANY,

SERVE:
Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

      Defendants.

Cause No.: **2026LA000209**

JURY TRIAL DEMAND

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead

Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Defendants").

Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences

and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters:

## NATURE OF THE ACTION

1.      This action arises out of the injuries suffered by premature infant N.A. ("Baby N.A."), who was given Defendants' cow's milk-based infant feeding products. Defendants' products caused Plaintiff to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, Plaintiff was seriously injured.

2.      Plaintiff Cynthia Acevedo brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of Baby N.A.'s consumption of Defendants' unreasonably dangerous cow's milk-based infant feeding products.

## PARTIES

3.      Plaintiff Cynthia Acevedo is a natural person and a resident of Florida.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

## JURISDICTION AND VENUE

5.      This Court has general jurisdiction over this action because Mead Johnson maintains its principal place of business in Illinois. 735 Ill. Comp. Stat. Ann. 5/2-209; *see also*

*Rios v. Bayer Corp.*, 2020 IL 125020, ¶ 19 (June 4, 2020) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).

6.      Venue is proper in Madison County because Defendants conduct business there. 735 ILCS 5/2-101; 735 ILCS 5/2-102(a).

## FACTUAL ALLEGATIONS

### *Baby N.A.'s NEC Diagnosis*

7.      Baby N.A. was born prematurely at Brandon Regional Hospital in Brandon, FL on August 17, 2021.

8.      Baby N.A. was fed Enfamil Milk Fortifier Liquid Standard Protein, which is a cow's milk-based product, shortly after his birth.

9.      Shortly after he first ingested Defendants' products, Baby N.A. developed NEC.

### *Cow's Milk-Based Feeding Products Are Known To Cause NEC*

10.      NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants. NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to 30 percent of NEC-diagnosed infants die from the disease.

11.      Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

12.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was *six to ten* times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and *three times* more common in babies who received a combination of formula and breast milk. For babies born at more than 30 weeks gestation, NEC was *20 times more common* in those only fed cow's milk formula than in those fed breast milk.

13.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were *90% less likely* to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

14.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

15.     A Surgeon General report, *The Surgeon General's Call to Action to Support Breastfeeding*, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis." The report also states that premature infants who are not breastfed are *138% more likely* to develop NEC.

16.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that *all* premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk. This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

17. A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC *21% of the time*.

18. Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

*Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

19. A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and milk fortifiers derived from pasteurized breast milk.

20. A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast

milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

21.     Defendants' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

22.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

23.     At the time Baby N.A. was fed Defendants' products, the science clearly demonstrated to Defendants that these products cause and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

24.     Despite the scientific consensus that Defendants' cow's milk-based products present a dire threat to the health and development of preterm infants, Defendants have made no changes to Mead products or the products' packaging, guidelines, instructions, or warnings. Instead, Defendants have continued to sell unreasonably dangerous products to unsuspecting parents and healthcare providers, generating huge profits as a result.

***Defendants' False And Misleading Marketing Regarding Cow's Milk Based Infant Products***

25.     Defendants have aggressively marketed Mead cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to Baby N.A. 's birth.

26. Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that Defendants' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. *None* of Defendants' marketing materials, including promotional websites, reference the science showing how significantly Mead products increase the risk of NEC.

27. Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

28. Undoubtedly aware of the impact of their advertising, Defendants, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

29. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

30. While Defendants acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip

service. Instead, Defendants' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

31. Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and "Includes expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

32. One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of **breast milk research** and

multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive **breast milk studies** to date" (emphasis added).

33.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free formula, coupons, and even entire gift baskets to parents in hospitals, medical clinics, and residential charities where out-of-town families stay while their babies receive long-term treatment in the NICU.

34.     Through this early targeting, Defendants create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for Defendants.  Defendants' gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their health care professionals, and they have been shown to negatively impact breastfeeding rates.

35.     Further, when Defendants recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Mead developed "Enfamil Human Milk Fortifier."  These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.  One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product.  The packaging appears as:



36.     Defendants have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider Defendants' cow's milk-based products a first choice. This marketing scheme is employed despite Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like Baby N.A.

### *Defendants' Inadequate Warnings*

37.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

38.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

39.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Enfamil's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

40.     Mead cites no medical literature or research to guide the use of its products.

41.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

42.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

43.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Safer Alternative Designs*

44.     Defendants' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. Defendants could have used pasteurized breast milk instead of cow's milk in Mead products, which would have produced a safer product.

45.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design

provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

46. On information and belief, Defendants were aware of the significantly increased risk of NEC and death associated with Mead cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Defendants have continued to use cow's milk as the foundation of Mead products.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

47. Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed information concerning known risks, side effects, and defects in their Mead products. Instead of revealing such information to the FDA or the public, Defendants have continued to represent their Mead products as safe for their intended use.

48. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with their Mead products. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of their Mead products, Defendants are estopped from relying on any statute of limitations defense.

## COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
### (Against All Defendants)

49. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

50. Mead, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to manufacture, sell, and distribute its products in a manner that was not unreasonably dangerous.

51. Mead also owed a duty to the consuming public in general, and Plaintiff in particular, to manufacture, sell, and distribute its products in a manner that was merchantable and reasonably suited for the intended use.

52. Mead knew that its products would be used to feed premature infants like Plaintiff and knew (or reasonably should have known) that use of Mead cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, Defendants continued to sell and market their defective products as appropriate for premature infants.

53. Baby N.A. ingested Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to Plaintiff outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

54. Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that Defendants' products do.

55. Mead's products contained cow's milk at the time they left the manufacturing facility.

56. Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate its products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

57. Mead's products were fed to Baby N.A., which directly and proximately caused his NEC and led to surgery.

58.     As a further direct result, Plaintiff incurred medical expenses and suffered significant emotional distress alongside other harms. Plaintiff's life has been significantly affected by Baby N.A.'s injuries.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against All Defendants)

59.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

60.     Mead, as the manufacturer and/or seller of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of Mead products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

61.     Mead's duty to warn is part of its general duty to design, manufacture, and sell its infant products in a manner that is reasonably safe for its foreseeable uses. By designing products with cow's milk-based ingredients, Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

62.     Specifically, Mead breached its duty to warn of the foreseeable risks of the infant products at issue in this litigation because it knew or should have known that its cow's milk-based premature infant products would be fed to premature infants like Baby N.A., and that its products might cause those infants to develop NEC, severe injury, or death, yet it failed to provide adequate warnings of those risks. Among other risks, Defendants:

    a. Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b. Failed to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like Baby N.A.; and/or

    c. Carried warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d. Failed to carry a large and prominent "black box"-type warning that its cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

    e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

    g. Failed to provide a warning in a method reasonably calculated or expected to reach the baby's parents; and/or

    h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

63. Mead's products contained cow's milk at the time they left the manufacturing facility.

64. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of its products, Baby N.A. was fed cow's milk-based products, which caused him to develop NEC.

65. The unwarned of risks are not of a kind that an ordinary consumer would expect. Had physicians and healthcare providers known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed Baby N.A. those products. Had Plaintiff's parents known of the significant risks of feeding Baby N.A. cow's milk-based formula, they would not have allowed such products to be fed to Baby N.A.

66. As a further direct result, Plaintiff incurred medical expenses and suffered significant emotional distress alongside other harms. Plaintiff's life has been significantly affected by Baby N.A.'s injuries.

## COUNT III: NEGLIGENCE
### (Against All Defendants)

67. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

68. Mead, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

69. At all times relevant to this action, Baby N.A.'s health care providers used the products at issue in their intended manner and for their intended purpose.

70. Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-

based infant products at issue in this litigation and thereby breached its duty to the general public and Plaintiff.

71. Specifically, although Mead knew or reasonably should have known at the time of production that its cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, it failed to act in a reasonably prudent manner and breached its duty by:

a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

b. Failing to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like Baby N.A.; and/or

c. Carrying warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failing to carry a large and prominent "black box"-type warning that its cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow its babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the baby's parents; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

72. In addition, although Mead knew or reasonably should have known at the time of production that its cow's milk-based products significantly increased the risk of NEC, serious injury, and death, it failed to act in a reasonably prudent manner and breached its duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest Mead products.

73. As a direct and proximate result of Defendants' failure to act in a reasonably prudent manner and their breach of duty, Baby N.A. was fed cow's milk-based products, which caused him to develop NEC.

74. Had Defendants satisfied its duties to the consuming public in general, Baby N.A. would not have been exposed to their unreasonably dangerous cow's milk-based products.

75. As a further direct result, Plaintiff incurred medical expenses and suffered significant emotional distress alongside other harms. Plaintiff's life has been significantly affected by Baby N.A.'s injuries.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against All Defendants)

76. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77. At all times relevant to this action, Baby N.A. (and his caretakers) used the products at issue in their intended manner and for their intended purpose.

78.     Mead, as the manufacturer and/or seller of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using Mead products when used in the intended manner and for the intended purpose.

79.     Mead breached its duty through misrepresentations made to consumers, physicians, and medical staff in Mead advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

80.     Specifically, upon information and belief, Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time Plaintiff was fed Mead products:

    a. That its cow's milk-based products were safe and beneficial for premature infants when it knew or should have known that Mead products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That its cow's milk-based products were necessary to the growth and nutrition of premature infants, when it knew or should have known that Mead products were not necessary to achieve adequate growth; and/or

    c. That its products have no serious side effects, when it knew or should have known the contrary to be true; and/or

    d. That cow's milk-based products were safe for premature infants; and/or

    e. That cow's milk-based products were necessary for optimum growth; and/or

Cause No.: _____

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That its products were safe and more like breast milk than other infant products and that it had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in Mead products was still capable of causing NEC, serious injury, and death; and/or

h.    That its products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that Mead products significantly increased the risk of NEC in premature infants.

81.    Mead knew or reasonably should have known those misrepresentations to be false.

82.    Defendants' misrepresentations were intended to, and in fact did, induce hospitals and health care providers, including Plaintiff's hospital and health care providers, to provide their infant products to babies, including to Plaintiff.

83.    Plaintiff's parents were not aware that these misrepresentations were false and justifiably relied on them. Defendants' misrepresentations induced Plaintiff's parents to allow Baby N.A. to be fed Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, Defendants' messaging. Had Mead not committed these intentional misrepresentations, Baby N.A. would not have been exposed to their unreasonably dangerous cow's milk-based products.

84.    As a direct and proximate result, Mead's products were fed to Baby N.A. causing his NEC and the subsequent health impacts.

85. As a further direct result, Plaintiff has incurred medical expenses and suffered significant emotional distress alongside other harms. Plaintiff's life has been significantly affected by Baby N.A.'s injuries.

## COUNT V: NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

86. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

87. At all times relevant to this action, Plaintiff used the products at issue in their intended manner and for their intended purpose.

88. Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

89. In the course of its business, Mead breached its duty through misrepresentations made to consumers, physicians, and medical staff in its advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

90. Specifically, upon information and belief, Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time Plaintiff was fed Mead products:

    a. That its cow's milk-based products were safe and beneficial for premature infants when it knew or should have known that Mead products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That its cow's milk-based products were necessary to the growth and nutrition of premature infants, when it knew or should have known that Mead products were not necessary to achieve adequate growth; and/or

c. That its products have no serious side effects, when it knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That its products were safe and more like breast milk than other infant products and that it had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in Mead products was still capable of causing NEC, serious injury, and death; and/or

h. That Mead products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that Mead products significantly increased the risk of NEC in premature infants.

91. Defendants negligent or careless in not determining those representations to be false.

92. Defendants' misrepresentations were intended to and did in fact induce hospitals and health care providers, including Plaintiff's hospital and health care providers, to provide Mead products to babies, including to Plaintiff.

93. Defendants' misrepresentations induced, and were intended to induce, Plaintiff's parents to allow Baby N.A. to be fed Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, Defendants' messaging. Had Defendants not committed these negligent misrepresentations, Plaintiff would not have been exposed to their unreasonably dangerous cow's milk-based products.

94. As a direct and proximate result, Mead Johnson's products were fed to Baby N.A., causing him NEC and the subsequent health impacts.

95. As a further direct result, Plaintiff incurred medical expenses and suffered significant emotional distress alongside other harms. Plaintiff's life has been significantly affected by Baby N.A.'s injuries, and related expenses.

## COUNT VI: BREACH OF EXPRESS WARRANTY
### (Against All Defendants)

96. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed infant products as herein above described that was fed to Plaintiff.

98. At all relevant times, Defendants expressly warranted to Plaintiff's parents and Brandon Regional Hospital, that Mead baby products were safe for ingestion by preterm infants such as Baby N.A.

99. At all relevant times, Defendants expressly warranted to Plaintiff's parents and Brandon Regional Hospital that the effectiveness of Mead Infant Products outweighed any

potential dangers and/or risks.

100. The aforementioned express warranties were made to Plaintiff's parents and Brandon Regional Hospital by way of Mead's labels, direct advertisement and/or marketing.

101. Upon information and belief, the aforementioned express warranties were made to Plaintiff's physicians by way of Mead's labels, information from Defendants' sales advertising and promotional materials.

102. Upon information and belief, the healthcare providers at Brandon Regional Hospital obtained the information regarding the efficacy and safety of Defendants' Infant Products from Mead labels.

103. Upon information and belief, Defendants expressly warranted to the healthcare providers at Brandon Regional Hospital by way of the product's label that Mead Infant Products were safe for ingesting by infants such as Plaintiff.

104. On or about August 17, 2021, through September 23, 2021, when Plaintiff's parents permitted Brandon Regional Hospital to use Defendants' Infant Products and throughout Baby N.A.'s ingestion of said products, Defendants expressly warranted to his parents, by way of the product's label, that Mead Infant Products were safe and effective.

105. On or about August 17, 2021, through September 23, 2021, when Plaintiff's parents permitted, Brandon Regional Hospital to use Defendants' Infant Products and throughout Baby N.A.'s ingestion of said products, Defendants expressly warranted to his parents, by way of the product's label, that Mead Infant Products were safe for infant ingestion.

106. As a result of Defendants' express warranties to Brandon Regional Hospital, physicians were induced to recommend feeding Plaintiff Defendants' Infant Products, and Plaintiff's parents were induced to permit Plaintiff's ingestion of said Infant Products from August

17, 2021 through September 23, 2021.

107. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff's parent, would permit the use and/or ingestion of said Infant Products based upon their express warranties.

108. At all relevant times, Defendants reasonably anticipated and expected that health care workers, such as the Plaintiff's health care providers at Brandon Regional Hospital would recommend and/or dispense said Infant Products based upon their express warranties.

109. At all relevant times Defendants knew or reasonably should have known that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death.

110. At all relevant times Defendants knew or reasonably should have known that their cow's milk-based products were not safe for ingestion by preterm infants such as Plaintiff.

111. At all relevant times, Defendants knew or should have known that their cow's milk-based products were unreasonably dangerous because the safety risk outweighed any benefit of other nutrition options available.

112. The unreasonably dangerous characteristics of these cow's milk-based products were beyond that which would be contemplated by the ordinary user, such as Plaintiff's parent, with the ordinary knowledge common to the public as to the said infant products characteristics and safety.

113. The unreasonably dangerous characteristics of cow's milk-based products were beyond that which would be contemplated by Plaintiff's healthcare providers, with the ordinary knowledge common to the public as to the cow's milk-based product's characteristics.

114. At the time the cow's milk-based infant products left the Defendants' control, these products did not conform to Defendants' express warranties because they were not safe to use as

a source for preterm infants, in that it was associated with NEC, severe injury, or death,

115. At the time the cow's milk-based infant formulas left the Defendants' control, these cow's milk-based infant formulas did not conform to Defendants' express warranties because the effectiveness of said cow's milk-based formulas does not outweigh any of the dangers and/or risks associated with the use of these formulas in preterm infants.

116. The express warranties made by Defendants regarding the safety and efficacy of cow's milk-based infant formula were made with the intent to induce Plaintiff's parents to use the product and/or Baby N.A.'s health care providers, Brandon Regional Hospital, to dispense the product.

117. Defendants knew and/or should have known that by making the express warranties to Plaintiff's parents and/or Plaintiff's healthcare providers, Brandon Regional Hospital, it would be the natural tendency of Plaintiff's parents to use cow's milk-based infant formula and/or Plaintiff's healthcare providers to recommend feeding preterm infants cow's milk-based formula.

118. Plaintiff's parents and Plaintiff's healthcare providers, Brandon Regional Hospital, as well as members of the medical community, relied on the express warranties of the Defendants identified herein.

119. The express warranties made by Defendants regarding the safety and efficacy of cow's milk-based infant formula induced Plaintiff's parents to use the product in feeding Baby N.A. and/or Baby N.A.'s healthcare providers to recommend using the product.

120. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

121. Plaintiff's injuries and damages arose from a reasonably anticipated use of the product by Plaintiff's parents and ingestion of the product by Baby N.A.

122. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff's parents and Baby N.A.

123. As a result of the foregoing breaches, Plaintiff was caused to incur serious injuries including NEC.

124. By reason of the foregoing, Plaintiff has been severely and permanently injured. As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.

## COUNT VII: BREACH OF IMPLIED WARRANTIES
### (Against All Defendants)

125. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed cow's milk-based infant formula as hereinabove described that was used by Plaintiff's parents and Baby N.A..

127. At the time Defendants marketed, sold, and distributed cow's milk-based infant formula for use by Plaintiff's parents and Baby N.A., Defendants knew of the use for which cow's milk-based infant formula and impliedly warranted the product to be of merchantable quality and safe and fit for ordinary use.

128. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff's parents and Baby N.A., would use and/or consume cow's milk-based infant formula for the infant's nutrition.

129. At all relevant times, Defendants reasonably anticipated and expected that

healthcare providers, such as Baby N.A.'s providers, Brandon Regional Hospital, dispense cow's milk-based infant formula for the feeding of preterm infants such as Baby N.A.

130.    At all relevant times, Defendants impliedly warranted to Plaintiff's parents, Baby N.A.'s healthcare providers, Brandon Regional Hospital, and the medical community that cow's milk-based infant formula was of merchantable quality and safe and fit for ordinary use in that it was safe to feed preterm infants such as Baby N.A.

131.    At all relevant times, Defendants impliedly warranted to Plaintiff's parents, Baby N.A.'s healthcare providers, Brandon Regional Hospital, and the medical community that cow's milk-based infant formula was of merchantable quality and safe and fit for ordinary use in that it was effective to use as a food source for preterm infants such as Baby N.A.

132.    At all relevant times, Defendants impliedly warranted to Plaintiff's parents, Baby N.A.'s healthcare providers, Brandon Regional Hospital, and the medical community that cow's milk-based infant formula was of merchantable quality and safe and fit for ordinary use in that the effectiveness of cow's milk-based infant formula outweighed any potential dangers and/or risks.

133.    At all relevant times, Defendants knew or should have known that cow's milk-based infant formula was unreasonably dangerous because of its increased risk of causing NEC, serious injury, and death when used in the form and manner as provided by Defendants.

134.    At all relevant times, Defendants knew or should have known that cow's milk-based formula was unreasonably dangerous because its safety risk outweighed any efficacy the formula may have.

135.    The unreasonably dangerous characteristics of cow's milk-based infant formula were beyond that which would be contemplated by the ordinary user such as Baby N.A.'s parent, with the ordinary knowledge common to the public as to the product's characteristics.

136. The unreasonably dangerous characteristics of cow's milk-based infant formula were beyond that which would be contemplated by healthcare providers, such as Baby N.A.'s healthcare providers, Brandon Regional Hospital, with the ordinary knowledge common to the public as to the product's characteristics.

137. At all relevant times and at the time cow's milk-based infant formula left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because cow's milk-based infant formula was not safe to use as a food source for preterm infants such as Plaintiff, in that it carried with it an increased risk of NEC, serious injury, and death.

138. At all relevant times and at the time cow's milk-based infant formula left the Defendants' control, the implied warranties made by Defendants were false, misleading and inaccurate because the effectiveness of cow's milk-based infant formula did not outweigh any the dangers and/or risks associated with these formulas in feeding preterm infants such as Plaintiff.

139. Plaintiff's parents relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to cow's milk-based infant formula.

140. Plaintiff's parents reasonably relied upon the skill and judgment of Defendants as to whether cow's milk-based infant formula was of merchantable quality and safe and fit for its intended use.

141. Upon information and belief, Plaintiff's healthcare providers, Brandon Regional Hospital, relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to cow's milk-based infant formula.

142. Upon information and belief, Plaintiff's healthcare providers, Brandon Regional Hospital, reasonably relied upon the skill and judgment of Defendants as to whether cow's milk-

based infant formula was of merchantable quality and safe and fit for its intended use.

143. Cow's milk-based infant formula was introduced into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

144. Defendants herein breached the aforesaid implied warranties, as their cow's milk-based infant formula was not merchantable nor fit for its intended purposes and uses.

145. Plaintiff's parents would not have used cow's milk-based infant formula and/or, upon information and belief, Plaintiff's healthcare providers, Brandon Regional Hospital, would not have provided cow's milk-based infant formula but for the aforesaid implied warranties.

146. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned implied warranties.

147. Plaintiff's injuries and damages arose from a customary, usual, reasonably foreseeable use of the product by Plaintiff's parents.

148. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NEC, and Plaintiff was caused to suffer other severe and personal injuries which are permanent and lasting in nature, including, physical and mental anguish, and diminished enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

149. For compensatory damages in an amount to be proven at trial;

150. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, loss of consortium, and other non-economic losses sustained as a result of Defendants' conduct;

151. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

152. For interest as permitted by law;

153. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

154. For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims triable.

Dated: February 9, 2026.

Respectfully submitted,

MORGAN & MORGAN

*/s/Panagiotis V. Albanis*
PANAGIOTIS V. ALBANIS
IL Bar #6277031
55 E. Monroe, Suite 3800
Chicago, IL 60603
4851 Tamiami Trail N, Suite 400
Naples, FL 34103
(239) 432-6605 Telephone
(239) 204-3798 Facsimile
palbanis@forthepeople.com

*Attorney for Plaintiff*

| STATE OF ILLINOIS, CIRCUIT COURT | **SUMMONS** | *For Court Use Only* |
|---|---|---|
| Madison COUNTY | | |

| | | |
|---|---|---|
| **Instructions ▼** | CYNTHIA ACEVEDO, et al. | |
| Enter above the county name where the case was filed. | **Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter your name as Plaintiff/Petitioner. | v. | |
| Enter the names of all people you are suing as Defendants/ Respondents. | MEAD JOHNSON & COMPANY, LLC, et al. <br> **Defendant / Respondent** *(First, middle, last name)* | **2026LA000209** <br> **Case Number** |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* | |

| | |
|---|---|
| **IMPORTANT INFORMATION:** | There may be court fees to start or respond to a case. If you are unable to pay your court fees, you can apply for a fee waiver. You can find the fee waiver application at: illinoiscourts.gov/documents-and-forms/approved-forms/. <br><br> E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit illinoislegalaid.org. <br><br> Call or text Illinois Court Help at 833-411-1121 for information about how to go to court including how to fill out and file forms. You can also get free legal information and legal referrals at illinoislegalaid.org. |
| **Plaintiff/Petitioner:** | Do not use this form in an eviction, small claims, detinue, divorce, or replevin case. Use the *Eviction Summons, Small Claims Summons, or Summons Petition for Dissolution of Marriage / Civil Union* available at illinoiscourts.gov/documents-and-forms/approved-forms. If your case is a detinue or replevin, visit illinoislegalaid.org for help. <br><br> If you are suing more than 1 Defendant/Respondent, fill out a *Summons* form for each Defendant/Respondent. |

| | |
|---|---|
| In 1a, enter the name and address of a Defendant/ Respondent. If you are serving a Registered Agent, include the Registered Agent's name and address here. | **1. Defendant/Respondent's address and service information:** <br> a. Defendant/Respondent's primary address/information for service: <br> Name *(First, Middle, Last)*: MEAD JOHNSON & COMPANY, LLC <br> Registered Agent's name, if any: Illinois Corporation Service Company <br> Street Address, Unit #: 801 Adlai Stevenson Drive <br> City, State, ZIP: Springfield, IL 62703 <br> Telephone: (866) 403-5272　　Email: |
| In 1b, enter a second address for Defendant/ Respondent, if you have one. | b. If you have more than one address where Defendant/Respondent might be found, list that here: <br> Name *(First, Middle, Last)*: <br> Street Address, Unit #: <br> City, State, ZIP: <br> Telephone:　　Email: |
| In 1c, check how you are sending your documents to Defendant/ Respondent. | c. Method of service on Defendant/Respondent: <br> ☐ Sheriff　　☐ Sheriff outside Illinois: _____ <br> *County & State* <br> ☑ Special process server　　☐ Licensed private detective |

| In 2, enter the amount of money owed to you. | 2. | **Information about the lawsuit:** |
| | | Amount claimed: $75,000.00 |
| In 3, enter your complete address, telephone number, and email address, if you have one. | 3. | **Contact Information for the Plaintiff/Petitioner:** |
| | | Name *(First, Middle, Last):*  Panagiotis V. Albanis, Esq. |
| | | Street Address, Unit #:  4891 Tamiami Trail N, Suite 400 |
| | | City, State, ZIP:  Naples, FL 34103 |
| | | Telephone: (239) 432-3798     Email:  palbanis@forthepeople.com |

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

| **Important information for the person getting this form** | You have been sued. Read all of the documents attached to this *Summons*. To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: illinoiscourts.gov/documents-and-forms/approved-forms/. |

| Check 4a or 4b. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box 4a. Otherwise, if the clerk gives you a court date, check box 4b. | 4. | **Instructions for person receiving this *Summons* (Defendant):** |
| | ☑ a. | To respond to this *Summons*, you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served *(not counting the day of service)* by e-filing or at: |
| | | Address:  155 North Main Street |
| | | City, State, ZIP:  Edwardsville, IL 62025 |
| In 4a, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response.* | ☐ b. | Attend court: |

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
    *Date*           *Time*              *Courtroom*

**In-person at:**

_____
*Courthouse Address*      *City*          *State*     *ZIP*

**OR**

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

By telephone:  *TO APPEAR BY ZOOM YOU MUST FILE A MOTION AND*
              *Call-in number for telephone remote appearance**PROPOSED ORDER*

By video conference: _____
           *Video conference website*

_____
*Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at: _____ or visit their website
           *Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
   *Website*

In 4b, fill out:
- The court date and time the clerk gave you.
- The courtroom and address of the court building.
- The call-in or video information for remote appearances (if applicable).
- The clerk's phone number and website.
All of this information is available from the Circuit Clerk.

| **STOP!** The Circuit Clerk will fill in this section. | **Witness this Date:**  2/12/2026 | *Seal of Court* |
| **STOP!** The officer or process server will fill in the Date of Service. | **Clerk of the Court:**  Patrick McRae  /s/ Melissa Epps | |

**This *Summons* must be served within 30 days of the witness date.**

Date of Service: ____2/16/26____

*(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.

Case 1:26-cv-03141 Document #: 1-1 Filed: 03/10/26 Page 35 of 37 PageID #:41

| STATE OF ILLINOIS, CIRCUIT COURT | PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION | For Court Use Only |
|---|---|---|

Madison _____ COUNTY

| Instructions | |
|---|---|
| Enter above the county name where the case was filed. | CYNTHIA ACEVEDO, et al. |
| | **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | |
| Enter the names of all people you are suing as Defendants/ Respondents. | **v.** MEAD JOHNSON & COMPANY, LLC, et al. |
| | **Defendant / Respondent** *(First, middle, last name)* |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

**2026LA000209**

**Case Number**

## **Stop. Do not complete the form. The sheriff or special process server will fill in the form.**

**My name is** _____ **and I state**

*First, Middle, Last*

☐ **I served the *Summons* and Complaint/Petition on the Defendant/Respondent**

_____ **as follows:**

*First, Middle, Last*

☐ Personally on the Defendant/Respondent:

Male ☐  Female ☐  Non-Binary ☐  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address, Unit#: _____

City, State, ZIP: _____

And left it with: _____

*First, Middle, Last*

Male ☐  Female ☐  Non-Binary ☐  Approx. Age: _____ Race: _____

and by sending a copy to this defendant in a postage-paid, sealed envelope to the

above address on _____ , 20 _____ .

☐ On the Corporation's agent, _____

*First, Middle, Last*

Male ☐  Female ☐  Non-Binary ☐  Approx. Age: _____ Race: _____

On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

Address: _____

City, State, ZIP: _____

2026LA000209

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____

*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

2.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

3.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

| |
|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. |

**If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.**

| |
|---|
| Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony. |

**By:**

_____

*Signature by:* ☐ Sheriff
☐ Sheriff outside Illinois:

_____
*County and State*
☐ Special process server
☐ Licensed private detective

_____
*Print Name*

**FEES**

Service and Return: $ _____
Miles _____ $ _____
Total $ 0.00

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

February 13, 2026

IN THE CIRCUIT COURT
FOR THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

CASE NUMBER: 2026 LA 000209

ACEVEDO CYNTHIA INDIVIDUALLY

Plaintiff(s)

VS.

MEAD JOHNSON & COMPANY LLC

Defendant(s)

FILED
FEB 13 2026
CLERK OF CIRCUIT COURT #56
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

NOT AN OFFICIAL COPY

ASSIGNMENT ORDER

The above case is hereby assigned to the Honorable SARAH SMITH for setting and disposition.

Clerk to send copies of this Order to the attorneys of record and any pro se party.

DATE: February 13, 2026

s/Christopher Threlkeld
Chief Judge

This case is assigned to Judge Ruth for Pre-trial. Thanks